May it please the Court, my name is Margaret McLean for the Plaintiffs in this matter. Good morning. So this appeal is in something of an unusual posture where we brought our opening brief primarily challenging the District Court's error in finding that a plaintiff who had transacted directly with one member of the conspiracy wasn't also an efficient enforcer with respect to the other members. In their opposition, defendants don't appear to contest that that was indeed an error that would justify a reversal, and instead they put forth an assortment of alternate grounds to affirm. Then the primary alternate grounds that they rely on, the allegations of injury, those arguments have effectively been foreclosed by this Court's recent opinion in Uribor, which found allegations of injury that are almost perfectly on all fours to those here to be sufficient. I can point us to the language because I think it's helpful. If we look at JA 3812 to 13 is where we have our allegations here, and then JA 781 of the Uribor appeal is where you have the allegations there. Both of them have CalSTRS entering into a three-month FX forward. It's going to be paying a foreign currency and receiving dollars in three months' time. The defendants are engaged in manipulating the three-month relevant Ibor rate upward at that time, Uribor and Uribor, Yen-Libor here, and CalSTRS is underpaid as a result. They're exactly on all fours. So that dispenses, in my view, with defendants' allegations that our allegations of injury are not sufficient. It really just leaves us with a few discrete matters to handle some of the additional. But what about the Sterling case? Do you read that as only requiring allegations of at least one transaction where you lose money? Yes, Your Honor. I mean, I think Sterling shows you, if you look at the actual complaint, it contrasts very helpfully. In Sterling, there was nothing when it comes to either the directionality or the timing of defendants' manipulations in relationship to their trades. Literally all it said was plaintiffs traded in Sterling LIBOR-based derivatives on such a date, and then during a period of time— So the problem there was the inference that if they're just going up and down and you don't have an allegation that you lost money on at least one transaction, we're not going to infer it. That's exactly right. It was saying— There was no language in the opinion about, you know, whether there was a net benefit or net loss from the scheme overall. That's exactly right. I think in Sterling, you have absolutely nothing to work with. The court is saying, I don't even have a springboard off of which I could give you an inference. If you put the two complaints next to each other, Sterling and Uribor, which were heard by the same panel, argued on the same date together, you can really see the contrast between them. Again, all Sterling says is defendants were manipulating Sterling LIBOR during that period of years that encompassed the transaction. You have nothing to work with. Whereas in Uribor, by contrast, just like here, you have quite a lot to work with in the way of specific allegations of manipulation in a direction that was unfavorable to the plaintiffs at the relevant time. So I think they're worlds apart from each other just in the level of detail in the regulatory findings that underlie the cases. You focus this to the transactions that I think are on page 13 of the reply brief. Are there other specific allegations that we should look at beyond these? And I get your statement that if we compare the two complaints, we're going to see that they're virtually identical. Sure. I'm glad you asked because it's true. We focused on that in our briefing just because we thought those were the strongest, but there are others as well. For example, if we look at JA-3806-208, there's some swap transactions by the other plaintiff Heyman in which Heyman is set to receive payments based on Yen LIBOR, and Yen LIBOR is being manipulated lower at that time, meaning that Heyman is getting less money for his money. Again, defendants' quibble with that is that it doesn't specify the specific tenor of Yen LIBOR that's being manipulated. Number one, I would say the court did not even go down that rabbit hole in your LIBOR. It was willing to give inferences there. Here, the chat that's cited has both three and six-month Yen LIBOR being manipulated. Those are two of the three most commonly manipulated tenors. That would be JA-3568 for that. It's, I think, a more than reasonable inference that the swaps are of one of those two. That's just one example. There are others as well. JA-3803 is another example of a Heyman swap. Let's look at the personal jurisdiction question. Normally, we have to decide jurisdictional issues before we reach the merits, right? Whether something's an antitrust injury, that's really a merits question about whether you're within the zone of interest of the antitrust laws, right? We should consider the question of the personal jurisdiction, at least of RBS and maybe the other defendants who contested. We've normally thought about the personal jurisdiction under the Clinton Act as also requiring a kind of international shoe analysis with the country. But the Supreme Court just said that the standards for personal jurisdiction under the Fifth Amendment and the Fourteenth Amendment are different. So should we think about the Clinton Act differently? I think, if anything, that would just relax the jurisdictional inquiry here when we're dealing with a federal statute and not having to even import the international shoe analysis. But I'm not even sure we need to worry about that too much because we very clearly have cleared that bar, in my view. It's really only RBS that we're talking about here where the district court found that we had not even failed to allege minimum contacts. RBS has an enormity of minimum contacts with the United States as a whole. It was just a question of venue in the Southern District because its headquarters was in Stanford rather than in the city. We've alleged that they had an office in New York that they themselves called a material entity significant to their operations that employed traders that served as a clearing member of the NYMEX. That's more than substantial in our view to justify venue, let alone. And do you think the claims here arise out of the contacts with the United States or with the ones on which you base personal jurisdiction? Certainly. So, again, I would separate the venue from the minimum contacts with the U.S. as a whole. Well, I mean, under the Clayton Act, the venue is tied up with the personal jurisdiction question, right? But I would say, yes, in the sense that there are derivatives traders. This is about derivatives trading. Okay. But in fold, the district court doesn't seem to think it is necessary if Congress says that there's personal jurisdiction over a defendant to say that the contacts give rise to the claims. For sure. And, again, we have many contacts in the U.S. that do give rise to the claims, the actual transactions with plaintiffs in the United States. But as far as the venue question, I think, yeah, we've certainly gone far beyond anything that fold would contemplate. And 4K2, is that also different now that we think that there's a different standard for the federal government as versus a state court? I think it plays the same role. It's sort of an alternate, a backstop. If you don't have specific enough contacts for any state, but you deal with the country as a whole, that it should step in. Well, the reason that we've said that you deal with the country as a whole is because we've been kind of importing the 14th Amendment standards into the Fifth Amendment. So maybe we don't need to do that to treat the United States as if it were one big state. But we think about it more in terms of the kind of reasonableness analysis that the Supreme Court does involve. And if we're going to take the reasonableness analysis, I think we easily meet that here when we're given that we're, again, talking about an entity that had a material entity office in the venue at the time. And can 4K2 be a kind of alternative to the Clayton Act? I mean, so one of the things you have to think about in 4K2 is whether the exercise of personal jurisdiction is consistent with the Constitution and laws. The Clayton Act is a law. So if the Congress has sort of said, here's when you get personal jurisdiction over an antitrust defendant, should that be the exclusive way to do it? Or can we still turn to 4K2 if you don't meet the Clayton Act requirements? I think you still can turn to 4K2. I mean, again, I don't think we need to here because we do meet the Clayton Act requirements. But I think we could. I think it's consistent with the principle of just generally looking at reasonableness, burden, all of those questions. Okay. Just because you said that your main argument was about suing the members of a conspiracy, the idea is that if defendants are engaged in the same conspiracy, they are responsible for the higher prices that you paid regardless of the party with whom you transacted. Regardless of whether they're the party with whom you transacted. That's true, Your Honor. And why is that? I mean, does it not make sense to say that you have a more direct relationship with the parties with whom you transacted? See, that's the nature of a conspiracy, that they're jointly and severally liable for each of those acts. And the way that it's alleged in our complaint is they're effectively taking turns helping each other out. Whether or not you were on one specific bank's turn or not, you're still part of that entire course of conduct that helped to injure you. Again, that is the principle of a conspiracy, acting as one and being held liable as one. You're injured by the conspiracy and not really by the individual transaction. I'm sorry? Well, you're saying that you're injured by the conspiracy and not necessarily by the particular transaction with the counterparty. Is that right? I'm saying you're injured by the actions of the conspiracy, one of which is the trade that you entered into. Right. You're saying there has to be a trade in which you were injured, but that determining whether you are an efficient enforcer has to do with the overall conspiracy. So you could be properly a plaintiff who can bring a claim against anyone who is part of the conspiracy, so long as you show that you were injured in at least one transaction with at least one conspirator, not with some third party. I think that's the thing we've primarily been concerned with knocking out, would be situations where a plaintiff brings a case saying, I was injured because the LIBOR conspiracy sort of affected every transaction, even though I never dealt with any of the people who were involved. I lost the question by the time I got to the end, but do you see what I'm saying? No, I'm nodding along with you because I agree with everything that you say. I think the distinction is between the group of banks of conspirators and then the group of third parties, on the other hand. I think it's also worth noting even the defendants never argued that it should be on a bank-by-bank basis. Everyone was thinking about conspirators versus non-conspirators. Some of those, assume that we, for the moment, don't count on it, but assume for the sake of this question that I agree with everything that you've said so far. You said at one point, well, there's still these various other loose ends that have to be dealt with. Some of them are fairly significant, right? Like, for example, you relied heavily in your initial presentation, I know you mentioned the Hayman entities, but you relied on CalSTRS. But if CalSTRS goes out for some reason, then we'd have to consider, and there are a couple of reasons that are alleged, right? One has to do with the way the statute of limitations plays on CalSTRS that might be different than how it plays on someone else. The other is the settlement that CalSTRS entered and whether that precludes some of these claims. If any of that works, then aren't you left relying on Hayman and having to find transactions involving Hayman that work? So, several answers. Number one, I think we do have transactions of Hayman's that work. Number two, I can address those two grounds about CalSTRS. My first question wasn't about those grounds, it was about the... Oh, just what's the effect if they did win? It's about the architecture, right? We would have to reach those, right? At least that would be one way of dealing with it. We have to deal with whether CalSTRS is a proper plaintiff at some level. If they were to win on both of those points as far as CalSTRS, then yes, we would need Hayman. Okay, before I get to another, I guess, sort of architectural question, I tend to agree with your thought about the conspiracy, and I sort of imagine that the defendants may not agree with it, but they certainly haven't tried to defend Judge Daniels' ruling, and they've relied on various other, perhaps more profound arguments. But, now I guess what I was going to ask. Oh, yes. Assume that it is true that so long as you dealt with a member of the conspiracy, that would be sufficient. What if that member that you dealt with settled, and no one has ever actually adjudicated whether you have alleged enough to make them a member of the conspiracy? Would that still be an open question for the district court if we otherwise agreed with you? So, two answers to that one. You're referring to the trades with J.P. Morgan. Number one, I actually think it's so clear on the face of the complaint that J.P. Morgan is plausibly alleged to be a member of the conspiracy that you could decide it. We could decide that ourselves. I really do think so. I mean, it's replete with allegations of J.P. Morgan conspiring directly with Tom Hayes. J.P. Morgan was found to be one of the members of what the European Commission called the Yen Interest Rate Derivatives Cartel. It's doing wash trades. It's full of it. You could absolutely do it. But if you didn't want to, yes, an option could be to remand it to the district court for consideration of whether J.P. Morgan is plausibly alleged to be a member of the conspiracy, and if the answer is yes, then Hayman is an efficient enforcer. And with regard to the Hayman entities, it seems that a lot of the transactions that they engaged in were with Merrill Lynch, which is an entity that the district court found was not a member of the conspiracy, right? And it's, I think you'd agree, the allegations against Merrill Lynch are considerably less substantial than the allegations against the other, or many of the other alleged members of the conspiracy. So if Merrill Lynch, if the district court is right about Merrill Lynch, that leaves us, I guess there is a J.P. Morgan swap that Hayman dealt with. These things require one to get very granular about very particular isolated transactions. I know. It's an annoying case in that way. Would you like to hear about Merrill Lynch? Yeah. Okay. So again, yes, the allegations are fewer in number, but I think in import, not so. The import of the chats cited at JA3653 and 3654 is not just that they did a tie board, lie board trade. It's that there's a Merrill Lynch trader who's doing a wash trade, a sham transaction with Tom Hayes in order to compensate. Yeah, he's doing one, right? That's sort of the problem now. Look, I'm a criminal lawyer. By trade, I know about conspiracies and how little it may take to make someone become a conspirator, at least in the criminal context. But here, that one act, you say, well, it's Tom Hayes. Do we know anything about... Like, the whole world knew that Tom Hayes was running a conspiracy, so anybody who ever dealt with Tom Hayes during the time of the conspiracy must have known what they were helping? Your Honor, I would say in the case of Tom Hayes, yes. Tom Hayes is alleged to have, or was, at times during the class period, 40% of the entire over-the-counter derivatives, Yan-Lai-Bo based derivatives market in the world. This is all he did. If you were dealing with Tom Hayes, you knew that. Maybe you knew he was dealing with lie board, but at that time, at that time, are we to assume that everyone in the market knew? Because this is before he's charged with a crime, right? Yes, but I would say that what the Merrill Lynch trader knows here is that he's doing something that's unlawful. He's helping to compensate the broker for something he shouldn't have been doing because there is no purpose to a wash trade. Yes, but don't you need more than that? Another thing that comes up in criminal law is you're not guilty of conspiring to import narcotics if you know that you've been hired to smuggle something, but you don't know what it is. You have to know it's narcotics to be agreeing to deal in narcotics. Is it the same here? I mean, wouldn't you need to know sort of what the illegality is? Because all that I see in that transaction is he's arranging a fake transaction to accommodate something that Hayes did. How do we know that there's culpable knowledge that what he's helping is an antitrust conspiracy affecting LIBOR? That is where I would return to. In this case, you do know that it's narcotics because you know that that is all that Tom Hayes does. I would also point out that there's an obvious familiarity between Tom Hayes and this Merrill Lynch trader and this R.P. Martin broker. They don't say, Alexis who? I mean, they know exactly who they're talking about. They know it by first name. And when he's asked to participate, he doesn't say why or what for. I would say that you can infer that these are kind of a slice of life of the conspiracy in the middle, right? That there's already a history of past doings. The wash trade is the way that the traders who participated in the conspiracy were compensated. And Tom Hayes is a figure in the conspiracy. So if you see him participating in a wash trade with a trader, it implies that they have been engaged in life or fixing before. Then this is compensation for it. And that's the inference you would have to draw. Yes, Your Honor. If you could draw that inference, then you would know that it would mean that they didn't do it knowingly because the idea is that they were coordinating. So you wouldn't coordinate unknowingly the way that you might smuggle something and not know that it's a drug. But can you infer from the idea that they did a wash trade that that must have been a reward for life or fixing? I think you can, Your Honor, because, again, there's no financial benefit to entering into a wash trade other than to generate the commission for the broker to curry favor, basically, with the broker and with the counterparty. There's no other reason for it. There's actually another chat in the complaint. But are there not many reasons why that broker might be entitled to a commission for some bad act? There's no... That has to be not just something related to LIBOR, even, but that has to be fixing LIBOR. So when it comes to Tom Hayes, that is what he did, that we have... I get that that's what he actually did. The question is, at the relevant time, can we infer that anyone who's in the financial business knew there was a gigantic conspiracy to fix LIBOR? I think you can infer that a person who knew Tom Hayes by first name and had prior dealings with him knew that that was his primary activity at that time.  I've gone way over. Would you like me to stop? You're from your adversary. Thank you. Thank you, Your Honor. May it please the Court. Starting with antitrust injury in the March 2008 CalSTRS FX forward transactions that opposing counsel started with, there are two key differences between this case and the Uribe case that she's referring to. First of all, in this case, the alleged manipulation attempt that is relied on was a single bank effort and according to the opinion in the Uribe case, what the Court said at page 8 of the opinion in the Uribe case is for any given manipulation, four to eight banks coordinated their prices. So Uribe understood the complaint in that case to be alleging that all the manipulations at issue were multi-bank manipulations. That's a very narrow way of reading a straight line from that opinion, isn't it? I mean, we have to look at the allegations of this complaint. It may be that the piece of evidence that relates specifically to this transaction is a piece that operates internally within one bank. But the overall allegations are attempting to persuade us, let's just put it that way, that there was an ongoing continual one hand washes the other arrangement among the banks so that if we see this kind of internal activity in the context of the overall allegations of the complaint, we can reasonably infer that this is part of the overall conspiracy. I guess Ms. McClain may enlighten us on rebuttal as to whether I've accurately stated their theory or whether they've got something else. But if that's the theory, what's wrong with that? Well, so I guess two things. Obviously, we have a disagreement about whether the complaint plausibly alleges conspiracy, but my point here is actually different. So even if what you said is true, which we don't concede, in the Sterling Libor-Santerra case that this Court decided two weeks ago, the Court said that when it's a single-bank manipulation effort, as we have here, this is at page 12 of the opinion, the slip opinion in the Santerra case, plaintiffs do not plausibly allege that a single manipulated report, that is, a single manipulation attempt by one bank, would have affected the final published rate. And the same is true here when you have only an allegation of a single attempt by one bank and no facts alleged. In other places, they do sometimes allege, oh, it had, you know, the other submissions were this, and that has an impact. But here, there's no allegation connecting a manipulation attempt by a single bank to an actual impact on the published rate. And what this Court said in the Santerra-Sterling-Libor case two weeks ago, when that's all you have, that's not a plausible allegation of impact on the rate. And, of course, it's only impact on the published rate that could conceivably harm the plaintiff. So that's one distinction between this case. On the 28-J letter, I think it was, they point out that they have all these allegations about the 50% question and how, like, introducing different estimates would end up affecting the overall rate. Why isn't that a plausible allegation that they are affecting the rate? Yes, Your Honor, that's at 3599 to 3600 of the joint appendix. But if you look at those allegations, it's not talking about this transaction. It's just talking about in the abstract, in general. It is possible, it says. It could move the fixing. It has the potential to impact the fixing. But the possibility, as the Supreme Court said in Twombly, is not plausibility, and they have to get over the plausibility hurdle. And in the Sterling-Libor case, this Court said it's a mere allegation that one bank attempted to manipulate the rate does not get us over the plausibility hurdle. So that's reason one, why there's no antitrust injury with respect to those transactions. Reason two is the allegation of antitrust injury with respect to those transactions depends on this formula allegation. And the formula was alleged in Uribor, as here, as counsel said. And in Uribor, the Court rejected the defendant's argument that the formula didn't do the trick. But what the Court said was the defendants argue that it's not actually true that the formula incorporates Yen-Libor, and therefore it doesn't follow, the conclusion doesn't follow. And this Court said in Uribor, that's a fact question. We're not going to decide it on pleadings. Here, however, in addition to that argument, which we made in the briefs, there's an additional argument that the Court's opinion in Uribor does not address and that we think this Court should address, which is the formula allegation is not plausible because the complaint itself incorporates, as support for the formula, an article that explicitly says, this is at footnote 15, the article at the incorporated footnote, sorry, 115, explicitly says that the actual prices for FX forward can, quote, exceed, close quote, or, quote, be much less, close quote, than the contract price. I'm sorry, than the price produced by the formula. That is, the formula does not, in fact, determine the actual price. It's just one of the considerations that factor into it. I understand. Isn't that exactly what in the Sullivan case, that's the Uribor case, right, that the panel said, at the pleading stage, we're not going to deal with that. Well, I think... It's a fact question, it was what was said. What the... You're saying that they allude to some academic somewhere in their complaint and therefore they're held to have alleged everything that that academic article said somewhere in it? They cite the article as support for their formula allegation, thereby incorporating the article into the complaint, as this Court has said in multiple cases. So therefore, because of that, that's how we can distinguish the holding in a prior case that said that's a fact question to be determined at a later stage. Well, my point was what the opinion in the Sullivan case says is a fact question is whether the formula incorporates E. N. Libor. That's a different question from whether the contract price is determined by the formula, and that's the point I'm making. And in addition, as we showed in our 28J letter, in fact... But that causation... I mean, a lot of these things that travel in the antitrust world under the heading antitrust injury, aren't they basically causation questions? Yes. Clearly, if there is an injury, it's an antitrust injury. And if you accept their theory, then they have standing to raise... Or even if you don't accept their theory, they have standing to argue that it's not really a standing question and it's not really about what kind of injury it is. It's really just a question of have they adequately alleged causation? Is that a fair statement? Yes, except that I would add antitrust injury is an implementation of the proximate causation standard. In Sterling Libor, this Court relied on antitrust injury and part of its analysis was the plaintiff in a multidirectional, bidirectional manipulation case where there's episodic manipulation has to do more. They have to connect the dots to show that there actually was a manipulation. Right, they have to... The specific dot that that case concerned, which I think is a very important one, is the bidirectionality one. They have to show that at least... It's not enough to say they were manipulating Libor on that very day. If that leaves open the question that, yes, they, for their own purposes, were manipulating Libor on that day in a direction that actually helped you rather than... So you have to show that it was in the right direction. Does that mean that every element, every possible causation issue gets decided at the pleading stage? Well, there has to be a plausible allegation of antitrust injury which requires a plausible allegation of proximate causation that the conduct alleged actually has to, in this case, with respect to the March 2008 transactions, the conduct alleged is an attempt by one bank to move its submission by one or two basis points on the relevant days. They have to show... They have to plausibly allege that that affected the rate and that the effect on the rate plausibly affected the price that they paid. And so when we think they failed both those steps... By the way, why would somebody engage in a major effort to get their bank to move their estimate by one or two points if the likelihood is not going to make any difference anyway? I don't know, Your Honor. But again, there's a difference, as Twombly said, between possibility and plausibility. And that's what this Court held in Santera. In a situation where somebody is doing something intentionally that is at least borderline illegal and certainly is in violation of their own employer's official standards and of the compact that was entered among the panel banks to create an objective LIBOR. And you're going to break all those rules to do something that has only a remotely possible effect on whether it's going to do you any good at all. Wouldn't it be more logical to conclude that the people who are doing this, putting aside even an inference that this is part of a larger arrangement that involves all the other banks, even if they haven't got a specific piece of evidence about that, relating to this particular trade, that the reason they're doing it, what else could it be other than that they think it's going to make a difference? The experts in the field who are engaged in this offensive conduct think it's going to work. Your Honor, I suspect I'm not going to persuade you, but this Court's decision in the Sterling LIBOR case says the opposite. And so we would just urge the Court to review that. It's sort of funny. I mean, the Sterling case and the Uragbor case decided by, with all respect to them, the same panel having heard argument on the same day. It's a little hard to square what's said in the one with what's said in the other, particularly with respect to the what's called front-line Australia transactions. It sure looks like you've got something being allowed to go forward in the one case, in the Uragbor case, and then something very similar is not allowed to go forward in the Sterling case. Well, again, on this point, I think it's very easy to square them because what the Court said in Uragbor was that four to eight banks participated in the attempted manipulations in that case, and only one did here. But if I may move on, because Your Honor, it also... Did you say that in the Sterling case the panel said that, you know, the bank might put in a lot of effort even though there's only a mere possibility it was going to move the rate? What they said... I understand that that case is being... It's just not clear that the plaintiff was harmed, right? Right. And one reason that it was not plausibly alleged that the plaintiff was harmed was because, as the Court said at page 12 of its opinion, that they didn't plausibly allege that a single manipulated report would have affected the final published rate. So that's the one point that I was making with respect to Sterling Library. But as Your Honor pointed out, Judge Lynch, in addition to this point, CalSTRS has other fundamental problems with its claim, particularly starting with the statute of limitations. The plaintiffs were clearly on notice from March of 2011 by the announcement of the LIBOR investigation by both the United States and Japanese authorities. It doesn't... It's not rocket science to suspect that when Japanese authorities are investigating LIBOR manipulation by panel banks that that might have something to do with Yen LIBOR. And indeed, there was another announcement. There were numerous articles about this, talking about the Japanese and United States authorities investigating, talking about the possible manipulation by UBS on its own or together with others. The Guardian reported that other institutions could be involved. The Wall Street Journal reported that investigators are probing U.S. and European banks for manipulation, multiple banks. Yes, Your Honor.  There was no tolling because there was no prosecution instituted. A complaint is merely a preliminary document filed in order to get an arrest warrant from a magistrate. It does not institute criminal proceedings. An indictment is required to institute criminal proceedings for a felony antitrust charge, which is what whips that issue here. The government has not instituted a criminal proceeding within the meaning of the tolling statute as the Ninth Circuit held in the Dungan case because the date an indictment returned is the date criminal proceedings commenced for purposes of the tolling statute. That's what the Court said in that case, and that's a bright-line rule that makes perfect sense. Well, the Ninth Circuit is the Ninth Circuit. This is a different place. But you're right. The word instituted is not the Ninth Circuit's word. That's the statutory word. That's what we're primarily concerned with. And then you added a phrase. You said it doesn't institute within the meaning of this statute. Now, that's, I think, what the question is, really, right? Because clearly, at least my criminal lawyer self says, it is foreign book law that it is the indictment that institutes a criminal proceeding, not the complaint. On the other hand, it all depends on the context. The courts use a whole bunch of cases where courts refer to a complaint as initiating. Maybe that's not quite the same thing as instituting a criminal proceeding. But those are civil cases, Your Honor, and a civil complaint, of course, under the statute. Oh, no, a civil complaint is an entirely different thing. Those cases are all about civil cases, civil complaints. The cases that they cite as supporting a complaint for the tolling purposes, those are civil cases, civil antitrust complaints by the FTC or by the Justice Department. What about Vitkus against Blinken? That's also not us. That's the Fourth Circuit, so I guess I shouldn't pay too much attention to that. My recollection is that those cases are all talking about civil complaints filed by the government, the FTC or the United States, depending on which case. Although an indictment, information, or complaint can take a different form, it is clear from the applicable rules that each form of charge initiates a criminal prosecution against the defendant. That's what the Fourth Circuit said in Vitkus. Whether it's a civil case or a criminal case, what they are referring to is what is the rule for instituting or initiating a criminal case. A complaint is good enough to start a case for purposes of the Sixth Amendment right to counsel, for example. It's not sufficient to start a case for purposes of the criminal statute of limitations. Yeah, that's true, too. So we submit the same rule. That's good. So that's the critical thing. Because what I'm trying to figure out is precisely the question of should we rely on the Hornbook rule that what institutes a criminal case is an indictment in this particular context? And it seems to me there's at least an argument that if the point of this tolling provision is to give civil antitrust plaintiffs an opportunity to benefit from the prosecution, I'm not sure why the filing of a fairly elaborate complaint that sets forth allegations about this very conspiracy wouldn't serve that purpose. Well, but if it depends on the level of detail, then we're back into an amorphous rule. Forget the detail, then. Maybe even a bare-bones complaint, but that does allege this particular conspiracy. Why wouldn't the purpose of Congress be served in saying that it's better that we don't then send civil plaintiffs off to start civil proceedings in the face of that, only to find out in the end that what the government can develop later in the criminal case would have been very helpful to them, but they wind up losing on the merits because they didn't have enough to allege all of these various things that you're raising in this case? Why wouldn't that be a good reason to interpret institute within the meaning of this statute a little differently than the way it's interpreted elsewhere? Because institute criminal proceedings has a subtle understanding, as Your Honor observed. So Congress probably was thinking in terms of the usual what institute's a criminal case. Exactly. That's how we normally construe statutes. An indictment does signal the formality means the government has gone further in its determination that it is proceeding with criminal charges. Signals something more definitive. But we don't have to reach this at all unless we agree with you that the March 15th disclosures were sufficient to put the plaintiffs on notice. I'm asking you to return to that and just elaborate a little. They didn't mention the yen LIBOR at all. So why does the reference to the Japanese authorities, why is that so important so that the plaintiffs should have been aware of something more than just potential wrongdoing? Well, because the fact... I mean, there are lots of authorities that ultimately have investigated different aspects of the LIBOR issue, but the fact that the Japanese authorities are investigating is obvious reason to think that the yen, the Japanese currency, might be involved or would be involved in the investigation, as indeed was the case. Moreover, the plaintiffs themselves, the plaintiffs' counsel, rather, themselves, in their latent yen LIBOR complaint, alleged that they had notice as of March 2011. This Court, in the BPP case, which was about a bankruptcy claim and whether the claimant, the bankrupt, was on notice of its potential claim, said that the announcements and the articles about the announcements and the filing of lawsuits immediately after the announcements were red flags that put that party on notice. It's perfectly reasonable to think that, at the very least, they were on inquiry notice as of March 2011 and certainly in April and May when all these other lawsuits had been filed and articles had been written talking about multiple panel banks being investigated. That's the Wall Street Journal. That article actually said that a possible reason for the manipulation was to bolster derivative positions such as interest rate swaps. So there was all sorts of publication about this, enough to raise red flags, as this Court said in the BPP case. And under this Court's precedence, when a plaintiff is on inquiry notice and fails to conduct a diligent investigation and there's not a shred of allegation of any diligent investigation in this complaint, they did nothing in response to these red flags. Under this Court's precedence in Foto and Merrill Lynch, the statute of limitations runs from the point that they were on inquiry notice, which was March of 2011. Can I ask about the personal jurisdiction question I was asking before? So we do need to decide jurisdictional questions before reaching merits questions, right? Yes. So we have this question about personal jurisdiction with RBS and I suppose other defendants also could test personal jurisdiction but the district court skipped over those. Was that a mistake, first of all, to skip over the personal jurisdiction question to reach antitrust injury or those other merits questions? I mean, in theory, yes. I think in theory, the district court should have addressed, should have dismissed UBS Japan and Lloyd's Banking Group also for lack of personal jurisdiction and the plaintiff doesn't even contest that in their brief on appeal. So that's clearly what should have happened to them. And I was saying, you know, traditionally we have this provision of the Clean Act that provides for a service of process and it's a way to get personal jurisdiction. We've traditionally thought about international issue being a kind of overlay on top of it because of the due process clause. We've applied these 14th Amendment standards but the Supreme Court has recently said that when you have a federal statute that extends personal jurisdiction, you don't rely on the 14th Amendment standards, right? So we should think about the Clayton Act differently now, shouldn't we? I don't think so because the rationale of this Court's decision in Daniel, which holds that Section 12 of the Clayton Act determines both venue and personal jurisdiction. The rationale is not, as I read it, based on the 14th Amendment but based on the text of the statute, right? Which says, first it says, here's how you establish venue, transacting substantial business in the district, and then it allows for... We need to meet those standards but then it seems like whenever a court determines that you've met those standards, they also determine whether the exercise of personal jurisdiction comports with due process. Yes, I think that's correct. That's what this Court said in Daniel. And so after, you know... Oh, right, I see what you're saying. So your position would be they don't even meet the statute. Correct, because they haven't... I guess I'm asking a sort of more fundamental question. Like, we don't need to think about... We don't think about the due process requirement in terms of the 14th Amendment standards anymore. We think about it in terms of what the Supreme Court said in full. But I think the idea that the statute is broader than what the due process standards would be means that, you know, there probably is a wider range of the kind of personal jurisdiction the Congress can authorize. I guess what I would say is I don't think our arguments on either side depend on fold here because our arguments are about the text of the statute and whether the text of the venue provision, which under the statute also determines personal jurisdiction, has been satisfied. Our position is it hasn't been satisfied certainly with respect to the other two defendants because they don't even contest it and also with respect to RBS because they don't allege any substantial business transacted within the Southern District of New York. They say in 2013, that's their evidence about RBS having an office or a branch office in New York in 2013, which is not the relevant date. According to them, the relevant date is when they filed their complaint in 2015. They don't have evidence of 2015. What RBS submitted in its declaration is that as of October 2020, it had no U.S. offices and in the recent years before that, it had them only in Connecticut. They do submit evidence of two offices of subsidiaries of RBS in New York. That's at... Sorry. That's at 3124-26 of the joint appendix. But of course, jurisdiction over subsidiaries, if it exists, does not establish jurisdiction over the parent. If they employed money market and derivatives traders in New York and was a clearing member for the New York Mortgage Tile Exchange, does that not count as transacting business in New York? So, clearing member certainly in and of itself does not count as transacting business. And the allegation about... Part of the New York Mortgage Tile Exchange wouldn't be transacting business in New York? Being a member? I don't think so, Your Honor. They have to allege that they're actually transacting substantial business and that doesn't allege anything about what, if anything, they've actually done with that membership. And the allegation about employees is different from what their brief suggests. What the allegation actually says at 3203 of the joint appendix is that RBS had a division, the Global Banking Division, and the division had employees in multiple legal entities and employed traders around the world in various places, including New York. But to say that it had employees in multiple legal entities goes back again to the subsidiary point that I made earlier. So it doesn't allege that RBS itself had employees that were trading in New York. So your position is the venue provision is not met with respect to New York? Correct. Or would it be with respect to Connecticut? Well, I mean, the deferred prosecution agreement that RBS entered into was entered into in Connecticut in the district court there. Their complaint alleges that RBS had a trading hub in Connecticut. And so whether they, you know, their complaint implies that they would have had jurisdiction in Connecticut, which is why Rule 4k-2 does not work. Do you think they would have had jurisdiction? I mean, isn't... Well, the test for Rule 4k-2 is whether you'd have jurisdiction under... whether a state court would have the jurisdiction under the laws of the state. Right. And they allege that RBS had a trading hub in Connecticut that was engaging in these transactions in the United States. And they've never alleged or identified any basis, whether through a certification or otherwise, for meeting their burden under Rule 4k-2 of establishing that RBS wasn't subject to jurisdiction in any other district. Well, so I don't represent RBS, and I certainly can't make a concession to that effect for them. But the burden is on the... Is RBS's position that it wasn't? The burden is on the plaintiff to show, to allege plausibly, or to show with evidence plausibly, that no state in the country would have had jurisdiction over RBS for these claims. They haven't even attempted to do that, so they can't qualify for Rule 4k. Thank you. And so, you know, we just heard before that you don't even contest that the district court made an error with respect to the efficient enforcer factors about suing other members of the conspiracy. Is that true? Well, so I'd put it slightly different. We interpret the district court's decision differently from how plaintiff interprets it. We would agree that if the only holding in the district court's decision were that direct... non-direct purchasers don't have antitrust standing, that, in and of itself, would not address claims for vicarious liability against other members of the alleged conspiracy. But the district court went on to say, in footnote 10, at some length, explaining why the broader conspiracy alleged in the complaint is simply not plausible. And for that reason, combined with the efficient enforcer analysis of the district court, it makes sense that it dismissed the other defendants. Of course, we believe that the judgment should... So if the allegations of the conspiracy were plausible, you think that somebody who purchased from one member of the conspiracy would be able to sue all members of the conspiracy? Well, I mean, we also think that under this court's cases, it shouldn't... I mean, it sort of depends on the nature of the conspiracy. If it were a true conspiracy where everyone had actually gotten together and agreed to do all these transactions, that would be one thing. But the problem here is the alleged conspiracy is really a rimless wheel with lots... There are very few conspiracies that I've ever seen where everyone sat around the table and signed in blood that they're going to commit a particular crime. That's not how it works. Conspiratorial agreements can be established by inference. And the inference is not, oh, they must have sat around a table and thought this through. The inference is that they all knew that they were engaged in a collective endeavor and each one agreed to play their part in it at some point or other. So I don't think we're talking about... It's not a true conspiracy if people didn't sit around a table and affirmatively decide this is what we're going to do if you've got people who are acting with full knowledge that they are engaged in a collective enterprise with a bunch of other people who also know the same thing. Yes, I agree with that. But the problem is that doesn't fit these facts because, again, this kind of goes beyond the scope of this appeal, I think, but the problem here is that most of the alleged manipulations in this complaint are single bank manipulations. Most of the rest are two bank alleged manipulations, right? So... And the theory as well that the other banks were somehow scratching each other's back, there's no allegation that other banks even knew about the alleged manipulations, let alone were somehow benefiting in any way. So the idea that all the banks were all conspiring to do all the manipulations that an individual bank did over five and a half years or that a pair of banks did over five and a half years, even though they didn't know anything about it and gained nothing from it, that doesn't make sense as a broad, overarching conspiracy. And I think that's what the district court was saying. There may be allegations sufficient to establish individual conspiracies or conspiracies among certain defendants in certain circumstances for a particular transaction or particular manipulation, but the idea that it's this broad, overarching, five and a half years, everybody's conspiring to do everything, every bad thing that any individual bank did at any time in five and a half years, even though they had no idea about it, didn't benefit from it, had no participation in it, and their cooperation wasn't needed to do it, that doesn't make any sense. Thank you. We'll hear rebuttal. All right. I'll be quick. So, to begin where we just ended there with the plausibility of the conspiracy, I would say that we can see actual evidence in real time, the unfolding of these conspirators agreeing effectively to take turns with each other and offering to return the favor doesn't necessarily mean that every bank was conspiring at every moment for every specific manipulation, but all were benefiting from it and helping each other in getting their turn as it came. I would point you to J.A. 3712 and 3715 for that. As far as RDS and venue, there was some discussion of timing of when the relevant period would be to look at for the jurisdictional context, and I would point you to the Metropolitan Life Insurance decision cited in our brief where this court found that it's a flexible inquiry that is looking at the period up to and including the filing of the initial complaint. Certainly not five years afterwards in 2020. You can't escape venue by moving five years into the pendency of litigation. And then... What about Connecticut? Is RDS subject to jurisdiction in Connecticut? Could you have sued RDS in Connecticut under the Connecticut state law? It's hard for me to say no, Your Honor. Your Honor? But you're not primarily relying on 4K. You're primarily... No, correct. That was more of a fallback to say it's inequitable effectively to let them off the hook for an activity that they clearly did in the United States, but our primary argument is under the venue statute that it was proper in the Southern District. Also just a few points as far as some of the URI board discussion that we were having earlier with counsel as far as the single bank versus the multibank. If we look at the particular chat that the panel cited in URI board, it's a single bank. It's just UBS. It's paragraph 313 on JA-778 of the URI board appendix. It's only UBS talking to UBS. So this notion that URI board was somehow supported by multibank chats in each and every instance is simply not the case. What is the case? And what can help you, I think, reconcile Judge Lynch, as you were asking before, how do you reconcile URI board and Sterling? I think you reconcile it simply by the weight of one versus the weight of the other. Even if you were to go ahead and pull the appendices for those two cases. The URI board appendix is 15 volumes of regulatory findings and pleadings. The Sterling is two. And I think that's what they were contrasting with each other, and they were able to say, okay, here, I can draw some inferences because you've given me a lot to work with in the way of concrete detail, and I think that's exactly the case of what we're dealing with here as well in Yann. A question about the statute of limitations and CalSTRS. CalSTRS didn't join this case until more than four years after the July date, not simply the March date. So even if we were to agree with you that the relevant date is July, that still poses a problem for CalSTRS. Your response to that, I think, was that they tried to intervene in this case or in some other case. So what they sought to intervene in 2014 within the statute in the parallel action laden, which is also challenging the same conspiracy, but with respect to futures products. So they sought in 2014 to interact. It was before Judge Daniels as well. He had both of them running both cases in parallel. It happens to be that it wasn't until 2015 that he ruled, I'm going to deny the motion to intervene on the grounds that this should be brought as a separate case. Not on the grounds that the case has no merit, but just that it should be brought separately. But I would say that it's inequitable to hold CalSTRS to the delay that it took to obtain that ruling. Everyone was on notice of CalSTRS' intent to bring these claims. There's no unfair surprise or significant rights. It's not like automatic if you get tolling, because if you try to intervene and it's denied, that's like a dismissal without prejudice. It doesn't toll the statute of limitations. But you should think because they had to wait for that ruling, and they thought they'd be able to pursue the claim, that as an equitable matter, we should just extend the statute of limitations. I do, Your Honor. Again, on the basis that, again, everyone is on notice that CalSTRS is looking to this. There's no surprise. There's no sitting on rights. And the denial of the motion to intervene wasn't on some kind of a merits ground, saying this complaint is no good, so I'm not going to let you intervene. Of course, that doesn't toll the statute. That's the majority of the cases that, or actually, it's all of the cases that the defendants cite. But here, we have the district court saying, yes, this is a good case. You should bring it. Just bring it separately. It just happens to have taken it some months to make that ruling. What about the statutory tolling? I mean, does the filing of a criminal complaint institute a criminal proceeding? I mean, I would say yes. I would say in the sense, again, of what Judge Lynch was referencing earlier, that it's against putting people on notice of the government is prosecuting this exact conspiracy. I seem out of time, but. Thank you both. Very helpful and very well argued on both sides. Thank you, Your Honor. We'll take the matter under advisement.